AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Blue Samsung Cellular Phone<br>Serial No. R58M300HY5E<br>IMEI I355865/10/229562/0 | ) ) ) ) ) ) )  Case No.  **19MJ3823** |

FILED
SEP 06 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952 and 960 | Importation of controlled substances and conspiracy |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Keith A. Banks, SA, Homeland Security Investigations
Printed name and title

Sworn to before me and signed in my presence.

Date: 9/6/19

_____
Judge's signature

City and state: San Diego, CA

Hon. Barbara L. Major, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Keith A. Banks, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices, as further described in Attachments A-1 and A-2 (the "**Target Devices**"), and seize evidence of violations of federal law, namely 21 U.S.C. §§ 952, 960, and 963, as further described in Attachment B:

> Blue Samsung Cellular Phone
> Serial No. R58M300HY5E
> IMEI I355865/10/229562/0
> ("**Target Device 1**" as described in Attachment A-1)

> Silver Samsung Cellular Phone
> Model No. SM-7327T1
> IMEI: 359479/09/166071/5
> ("**Target Device 2**" as described in Attachment A-2)

This search warrant supports an investigation and prosecution of Pedro Vazquez Osuna ("VAZQUEZ"), who is currently charged with committing violations of 21 U.S.C. §§ 952 and 960. A factual explanation supporting probable cause follows.

2. Officers with the Department of Homeland Security, United States Customs and Border Protection ("CBP"), seized the **Target Devices** from VAZQUEZ on May 29, 2019, when he was arrested at the Otay Mesa, California, Port of Entry ("POE") for drug smuggling, in violation of 21 U.S.C. §§ 952 and 960. Specifically, VAZQUEZ was found in possession of approximately 43.12 kilograms of methamphetamine. The **Target Devices** are currently in the possession of the Department of Homeland Security and are presently stored at 949 Customhouse Plaza, San Diego, California 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as more particularly described in Attachment B.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to investigators about this investigation. It contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of drug investigations, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated. Dates and times are approximate.

## TRAINING AND EXPERIENCE

5. I am a Special Agent with the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between U.S. Drug Enforcement Administration and ICE. Furthermore, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

6. I have held my current position with HSI since August of 2016. I was employed as a Customs and Border Protection ("CBP") Officer from March of 2012 to August of 2016 prior to entering on-duty as an HSI Special Agent. I obtained a Bachelor of Arts, with honors, in Political Science from the California State University, Dominguez Hills in Carson, California.

7. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program ("CITP") and the Homeland Security Investigations Special Agent Training ("HSISAT") course. During these courses, I was

trained in various types of criminal investigations, to include investigations involving the illegal trafficking of narcotics, currency, firearms and contraband.

8. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

9. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

10. During my tenure, I have participated in numerous investigations involving narcotic and human trafficking and have performed various investigative tasks involving the following:

   a. Functioning as a case agent which entails the supervision and case development of specific aspects surrounding the trafficking of narcotics and humans;
   b. Functioning as a surveillance agent and thereby observing and recording movements and methods of those involved in the trafficking of narcotics and humans;
   c. Interviewing of material witnesses, principals, load drivers, north side coordinators and other persons involved in the trafficking of narcotics, humans and the distribution of monies and assets derived from such illegal activities; and
   d. Participating in investigations involving the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, and the interviews of confidential sources;

*Affidavit in Support of Search Warrant* 3

e. Supervising, as a case agent/co-case agent, specific investigations involving trafficking of humans, narcotics, weapons and the laundering of monetary instruments.

11. As a law enforcement officer, I have participated in approximately 100 arrests for narcotics-related and money laundering-related offenses. I have participated in over 20 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotics investigations, or interviews of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of gangs and drug trafficking organizations and the various methods these organizations use to carry out their violent crime and narcotics trafficking activities.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics and human trafficking investigations, I am also aware that:

   a. Drug traffickers will use digital devices like cellular telephones because they are mobile, and they have instant access to telephone calls, text, web, email, and voice messages;

   b. Drug traffickers will use digital devices like cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

   c. Drug traffickers and their accomplices will use digital devices like cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

   d. Drug traffickers will use digital devices like cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Drug traffickers will use digital devices like cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f. The use of digital devices like cellular telephones by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Individuals involved in the illegal possession and acquisition of drug trafficking often utilize digital devices like cellular telephones with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, drugs, criminal proceeds, and assets purchased with criminal proceeds.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the

         importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

14. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

15. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that

coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS IN SUPPORT OF PROBABLE CAUSE

16. According to the report of CBP Officer S. Mejia, at about 12:44 a.m. on May 29, 2019, Officer Mejia was assigned to primary vehicle inspection lane 5 at the Otay Mesa POE. At that time, VAZQUEZ drove a gold 2002 Ford F-150 truck, with California license plate DP 151NK (the "Ford F-150"), into the primary-inspection lane and presented his permanent residence card. He also told Officer Mejia that he did not have anything to declare. Per Officer Mejia's report, at this time, CBP Officer Murray conducted an inspection of the Ford F-150 with his K-9 Unit, and the K-9 Unit alerted. Officer Murray informed Officer Mejia of the K-9 Alert, and Officer Mejia again asked VAZQUEZ if he had anything to declare. VAZQUEZ again said he did not. At that point, Officer Mejia asked VAZQUEZ to step out of the Ford F-150. Officer Mejia placed VAZQUEZ in handcuffs and handed him over to another officer, who escorted VAZQUEZ to the security office. Officer Mejia referred to Ford F-150 to the secondary area for further inspection.

17. According to the report of CBP Officer Murray, at about 12:44 a.m. on May 29, his K-9 Unit alerted on the rear undercarriage area of the Ford F-150. After the K-9 Unit alerted, Officer Murray used his screwdriver to tap on the spare tire that was mounted to the undercarriage, and found that it was unusually solid. Officer Murray informed Officer Mejia, and advised Officer Mejia to place VAZQUEZ in handcuffs.

18. According to the report of CBP Officer S. Richardson, Officer Richardson was asked to screen the Ford F-150 in the "Z-Portal" X-Ray machine. (I am aware that the Z-Portal machine is located in the secondary-inspection area at the Otay Mesa POE.) Officer Richardson screened the Ford F-150 and saw anomalies in the spare tire and in the rear wall of the cab.

19. According to the report of CBP Officer Dela Cruz, Officer Dela Cruz was assigned to the inspection of the Ford F-150. At about 1:15 a.m., Officer Dela Cruz removed a package from the rear seat of the Ford F-150 (*i.e.*, from the seats positioned against the

rear wall of the cab). Officer Dela Cruz probed the package and found that it contained a crystalline substance; initial testing on the substance confirmed the presence of methamphetamine. At about 1:25 a.m., Officer Dela Cruz placed VAZQUEZ under arrest for a violation of 21 U.S.C. §§ 952 and 960.

20. Following the arrest, Officer Dela Cruz continued his search of the Ford F-150, and found eighty-eight packages. Officer Dela Cruz found twenty-one packages in the rear seats, eight packages in the rear driver-side door, ten packages in the rear passenger-side door, and forty-nine packages were in the spare tire. The drugs, F-150, **Target Devices**, and other items were seized. (The CBP Officers' reports do not indicate whether the **Target Devices** were seized directly from VAZQUEZ or from the Ford F-150; however, in my training and experience, I know that when a person is taken to the security office and their car searched, CBP will gather all the personal effects from the person and secure them; if the person is arrested, those items are seized.)

21. I was notified of VAZQUEZ's arrest and responded to the Otay Mesa POE. Upon my arrival, I made contact with VAZQUEZ and was provided with the personal effects seized from VAZQUEZ. Included among those personal effects were the **Target Devices**.

22. At about 4:00 a.m., I read VAZQUEZ his *Miranda* rights, which he waived. In summary, VAZQUEZ made the following statement. VAZQUEZ said that he works as a mechanic, and that he enters the United States from Mexico on a daily basis. At about 1:00 p.m. on May 28, he had taken the Ford F-150 to a stereo-repair shop in Tijuana to have the stereo repaired; the employees had replaced the stereo and removed an amplifier. VAZQUEZ was informed that the repairs were complete between 8:00 p.m. and 9:00 p.m. The repair shop did not call VAZQUEZ to let him know the repairs were complete; rather, the shop called his neighbor. VAZQUEZ also denied knowledge of the drugs.

23. Before the interview, I had also looked through the Ford F-150 and found a notebook with handwritten notes. This notebook contained names, phone numbers, and addresses, along with measurements in grams and ounces. Based on my training and

experience investigating drug-trafficking cases, I recognized this notebook as a ledger for drug sales (or a "pay/owe" ledger). I asked VAZQUEZ about the notebook, and he denied being involved in drug trafficking.

24. Given the facts surrounding the arrest of VAZQUEZ, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activity of VAZQUEZ will be found in the **Target Devices**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data:

   a. tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

   e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

   f. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

   g. tending to place in context, identify the creator or recipient of, or establish the

*Affidavit in Support of Search Warrant*  9

time of creation or receipt of communications, records, or data involved in the activities described above.

25. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of VAZQUEZ, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. For the reasons set forth above, I request permission to search the **Target Devices** for items listed in Attachment B for the time period from March 31, 2019, up to and including May 30, 2019, the day following VAZQUEZ's arrest.

## **METHODOLOGY**

26. It is not possible to determine, merely by knowing a cellular telephone's or tablet's make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices—both phones and tablets—over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones and tablets do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models, and some tablets, using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure

may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

29. At the time of VAZQUEZ's entry to the United States, investigators conducted a forensic download of the **Target Devices**. I have not relied on any information obtained from that forensic download in this warrant application. Going forward, the Government will rely only on reviews of the **Target Devices** authorized by this warrant (and any others the Government obtains).

## CONCLUSION

30. Based on all of the facts and circumstances described above, I believe probable cause exists to conclude that VAZQUEZ used the **Target Devices** to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

31. Because the **Target Devices** were promptly seized following the arrest of VAZQUEZ at the Otay Mesa POE, there is probable cause to believe that evidence of the smuggling offense committed by him continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from March 31, 2019, up to and including May 30, 2019.

32. WHEREFORE, I request that the court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search the **Target Devices**, as described in Attachments A-1 and A-2, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

KEITH A. BANKS
Homeland Security Investigations Special Agent
Department of Homeland Security

Subscribed and sworn to before me on this ___ day of September, 2019.

THE HON. BARBARA L. MAJOR
Chief United States Magistrate Judge

# Attachment A-1

## *Item to be Searched*

The item to be searched is as follows:

> Blue Samsung Cellular Phone
> Serial No. R58M300HY5E
> IMEI I355865/10/229562/0
> ("**Target Device 1**")

**Target Device 1** is currently in the possession of the Department of Homeland Security and is presently stored at 949 Customhouse Plaza, San Diego, CA 92154.

## Attachment B

### *Items to be Seized*

Authorization to search the **Target Devices** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, from March 31, 2019 up to and including May 30, 2019:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    a. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

1  which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.